UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

ANGELA McDAY,

        Plaintiff,

v.

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.

Case No. 1:09-cv-1085

Honorable Robert Holmes Bell

**REPORT AND RECOMMENDATION**

      This is a social security action brought under 42 U.S.C. § 1383(c)(3) seeking review of a final decision of the Commissioner of Social Security finding that plaintiff was not entitled to supplemental security income (SSI) benefits. The Social Security Administration considered plaintiff's application for benefits as having been filed on October 25, 2006, under the protective filing doctrine.[1] She alleged a December 16, 2005 onset of disability.[2] (A.R. 106-09). Her claim was denied on initial review. (A.R. 66-69). On April 9, 2009, plaintiff received a hearing before an administrative law judge (ALJ), at which she was represented by counsel. (A.R. 30-63). On May

---

[1]Plaintiff filed her application for SSI benefits on November 7, 2006. Protective filing date is a term for the first time an individual contacts the Social Security Administration about filing for benefits. *See* http://www.ssa.gov/glossary.htm (last visited Mar. 8, 2011). A protective filing date allows an individual to have an earlier application date than the date the signed application is actually filed. *Id.*; *see Slaughter v. Astrue*, No. 3:09-cv-233, 2010 WL 3909363, at * 1 n.2 (S.D. Ohio Mar. 31, 2010).

[2]SSI benefits are not awarded retroactively for months prior to the application for benefits. 20 C.F.R. § 416.335; *see Kelley v. Commissioner*, 566 F.3d 347, 349 n. 5 (3d Cir. 2009); *see also Newsom v. Social Security Admin.*, 100 F. App'x 502, 504 (6th Cir. 2004). The earliest month in which SSI benefits are payable is the month after plaintiff's protective filing date. Thus, November 2006 is plaintiff's earliest possible entitlement to SSI benefits.

6, 2009, the ALJ issued a decision finding that plaintiff was not disabled. (A.R. 15-26). On October 9, 2009, the Appeals Council denied review (A.R. 1-3), and the ALJ's decision became the Commissioner's final decision.

On December 2, 2009, plaintiff filed her complaint seeking judicial review of the Commissioner's decision denying her claim for SSI benefits. Plaintiff asks the court to overturn the Commissioner's decision on the following grounds:

1. The Commissioner failed to examine the cumulative effects of plaintiff's severe impairments;

2. The Commissioner failed to defer to plaintiff's treating physician's testimony;

3. The hypothetical question the ALJ posed to the Vocational Expert (VE) was inaccurate, and did not "properly address" plaintiff's cumulative impairments; and

4. The ALJ applied a "sit and squirm" test.

(Statement of Errors, Plf. Brief at iii, docket # 9). Upon review, I find that plaintiff's arguments do not provide a basis for disturbing the Commissioner's decision. I recommend that the Commissioner's decision be affirmed.

**Standard of Review**

When reviewing the grant or denial of social security benefits, this court is to determine whether the Commissioner's findings are supported by substantial evidence and whether the Commissioner correctly applied the law. *See Elam ex rel. Golay v. Commissioner*, 348 F.3d 124, 125 (6th Cir. 2003); *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001). Substantial evidence is defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Heston v. Commissioner*, 245 F.3d 528, 534 (6th Cir. 2001) (quoting *Richardson v.*

*Perales*, 402 U.S. 389, 401 (1971)); *see Rogers v. Commissioner*, 486 F.3d 234, 241 (6th Cir. 2007). The scope of the court's review is limited. *Buxton*, 246 F.3d at 772. The court does not review the evidence *de novo*, resolve conflicts in evidence, or make credibility determinations. *See Walters v. Commissioner*, 127 F.3d 525, 528 (6th Cir. 1997). "The findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive . . . ." 42 U.S.C. § 405(g); *see McClanahan v. Commissioner*, 474 F.3d 830, 833 (6th Cir. 2006). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. . . . This is so because there is a 'zone of choice' within which the Commissioner can act without fear of court interference." *Buxton*, 246 F.3d at 772-73. "If supported by substantial evidence, the [Commissioner's] determination must stand regardless of whether the reviewing court would resolve the issues of fact in dispute differently." *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993); *see Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996) ("[E]ven if the district court -- had it been in the position of the ALJ -- would have decided the matter differently than the ALJ did, and even if substantial evidence also would have supported a finding other than the one the ALJ made, the district court erred in reversing the ALJ."). "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Commissioner*, 336 F.3d 469, 477 (6th Cir. 2003); *see Kyle v. Commissioner*, 609 F.3d 847, 854 (6th Cir. 2010).

**Discussion**

The ALJ found that plaintiff had not engaged in substantial gainful activity on or after October 25, 2006. (A.R. 17). Plaintiff had the following severe impairments: "discogenic and degenerative disorders of the lumbar spine; degenerative joint disease of the left ankle; status post [December 2005] cerebral vascular accident;[3] hypertension; migraine headaches; and depression." (A.R. 17). The ALJ found that plaintiff did not have an impairment or combination of impairments which met or equaled the requirements of the listing of impairments. (A.R. 18). He found that plaintiff retained the following residual functional capacity (RFC):

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR [§ 416.967(a)], allowing the claimant the option to sit or stand alternatively at will provided that the claimant is not taken off task more than 10% of the work period. Claimant can never climb ladders, ropes or scaffolds, or crawl. Claimant can occasionally climb ramps or stairs, balance, stoop, crouch and kneel. Claimant can only occasionally reach overhead. Claimant can frequently handle objects (gross manipulation) and frequently finger (fine manipulation[]). Claimant must avoid concentrated exposure to strobing, flashing or bright lights. Claimant must avoid concentrated exposure to unprotected heights. Claimant's work is limited to simple, routine and repetitive tasks.

(A.R. 21).

The ALJ found that plaintiff's testimony regarding her subjective limitations was not fully credible:

> The claimant reported her ability to work is limited due to back pain, ankle pain, and residual effects from a stroke. She further reported that her condition adversely affects her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, remember, complete tasks, concentration, understand, follow instructions, use hands, and get along with others (Exhibit 2E)[A.R. 123-30] She rated her back/leg pain a 3 out of 10 on a 0-10 scale, with 10 being the

---

[3] The ALJ noted on page four of his opinion (A.R. 18) that plaintiff had been hospitalized in December 2005 for a bilateral carotid dissection (A.R. 188-209, 246-52, 262-63, 277-83) and on February 14, 2007, plaintiff underwent a "successful stenting of dissection and pseudoaneurysm of the right coronary artery." (A.R. 303-08).

most severe. She described the pain as throbbing and said that pain occurs on a daily basis. She testified that her headaches occur 5-7 days a week, and rated the headache pain a 5 out of 10.

* * *

The claimant has described daily activities which are not limited to the extent that one would expect, given the complaints of disabling symptoms and limitations. As aforementioned, the claimant takes her children to school and picks them up. She also drives herself to her doctor's appointments, and conducts business over the telephone. She is able to prepare meals for herself and her family (Exhibit 2E)[A.R. 123-30].

Another factor influencing the conclusions reached in this decision is the claimant's generally unpersuasive demeanor while testifying at the hearing. The claimant was able to participate in the hearing closely and fully without being distracted, and without any overt pain behavior. It is also noted that the claimant's testimony at the hearing was inconsistent with the medical evidence of record in its entirety. It is emphasized that this observation is only one among many being relied on in reaching a conclusion regarding the credibility of the claimant's allegations and the claimant's residual functional capacity.

The objective medical evidence does not fully support and is inconsistent with the claimant's subjective complaints. In terms of the claimant's alleged discogenic and degenerative disorders of the spine/degenerative joint disease, on examination December 27, 2005, the claimant's gait was intact. Her station and posture were normal. Romberg test was negative (Exhibit 3F)[A.R. 232]. On examination March 2, 2007, motor strength testing was 5/5 in all muscle groups tested in the upper and lower extremities. Sensory examination was intact to light touch. Deep tendon reflexes were 2/4 and symmetrical in the upper and lower extremities. There was no pretibial edema, clubbing, or cyanosis. The claimant was able to ambulate under her own power, without using any external walking assist devices. Heel walking, toe walking, and tandem gait were normal. R[]omberg testing was also normal. Examination of the dorsolumbar spine revealed no paravertebral muscle spasm or gross abnormalities. Straight leg raising was positive in the seated position at 90 degrees bilaterally, with more pain being felt on the left side (Exhibit 7F)[A.R. 309-18]. On October 12, 2007, there was tenderness noted in the upper back, bilateral trapezius, and paracervical muscle[s] (Exhibit 9F)[A.R. 350].

Concerning the claimant's cerebral vascular accident, on examination February 13, 2006, she was seen [for a] follow-up [examination] after being diagnosed with bilateral carotid dissection with neurological changes, particularly left-sided weakness. On examination there was only mild left-sided weakness noted. Her carotid duplex study showed that they appeared widely patent, although the velocities were on the low side. She had been fully anticoagulated. A Duplex Doppler Ultrasound of the Extracranial Carotid Arteries was performed on November 8, 2006. There was no evidence of plaque, intimal flap, aneurysm

or stenosis in the visualized cervical carotid arteries (Exhibit 3F)[A.R. 237-38, 266]. On examination March 2, 2007, finger to nose, this was performed without significant tremors, dysmetria, or pronator drift. Apposition testing was normal. Cranial nerves tested were grossly intact. Examining physician, June D. Hillelson, D.O., noted that the claimant experienced some relief from her medications, and had no symptoms consistent with a radiculopathy (Exhibit 7F)[A.R. 309-18].

With regard[] to the claimant's hypertension, on examination April 22, 2006, the claimant's blood pressure was 122/72, pulse 68. A Stress Echocardiogram on August 3, 2006, reported that the claimant had an estimated ejection fraction between 55 and 60 %. On July 26, and August 9, 2006, physical examination was essentially unrevealing. The claimant had presented with epigastric and retrosternal pains, describing them as feeling like "someone squeezing her heart." The claimant noted that these episodes lasted up to five minutes or so. She had regular heart rhythm. There were no murmurs, thrills, or extra sounds. S1 and S2 were also normal. Also, an ultrasound of the gallbladder was normal (Exhibit(s) 2F and 3F)[A.R. 210-11, 214, 253-58]. Cardiovascular examination on December 12, 2006[,] and March 15, and June 15, 2007, revealed no thrills, lifts, or palpable S3 or S4. The heart had regular rate and rhythm, with no murmurs, gallops, rubs, or abnormal sounds. PMI was not displaced (Exhibit 9F)[A.R. 363-64, 368-69, 378].

Lastly in assessing the severity of the claimant's migraine headaches, the medical evidence of record shows that on examination April 22, 2006, the claimant's visual fields were full to confrontation. Extraocular movements were full, facial sensation was intact and her face was symmetrical and strong. Examining physician, Jeffrey J. VanWingen, M.D., noted that the claimant's migraines were common with hypertension. Medical records dated November 2006 indicated that the claimant's migraines were doing better with an increase of her medication, Toprol XL. A MRI/MRA of the brain on July 15, 2006, revealed no evidence of acute abnormality. There was also no acute or subacute infarct identified (Exhibit 3F)[A.R. 215-16, 240, 265]. A CT scan of the brain on September 23, 2008 was normal (Exhibit 9F)[A.R. 383-84].

* * *

In sum, I have made every reasonable effort to obtain available information that could shed light on the credibility of the claimant's statements regarding the nature and severity of her impairment(s) as relates to her activities of daily living, the location, duration, frequency, intensity of symptoms, the factors that exacerbate symptoms, the dosage and any claimed side-effects of her medication, her treatment, any other measures used other than treatment/medication, and any other factors concerning functional limitation (20 C.F.R. 416.929(c)). I find that while the claimant may undoubtedly experience some pain, limitations, and restrictions from her impairments, the medical record in its entirety demonstrates that the claimant has no greater limitations in her ability to perform work activities than those reflected in the residual functional capacity reached in this decision.

(A.R. 22-24). Plaintiff did not have past relevant work. (A.R. 24). Plaintiff was thirty-seven years old when she filed her application for SSI benefits and she was forty years old as of the date of the ALJ's decision. Thus, at all times relevant to her claim for SSI benefits, plaintiff was classified as a younger individual. (A.R. 24). Plaintiff has at least a high school education and is able to communicate in English. (A.R. 24). The ALJ found that the transferability of jobs skills was not material because plaintiff did not have past relevant work. (A.R. 24). The ALJ then turned to the testimony of a vocational expert (VE). In response to a hypothetical question regarding a person of plaintiff's age, and with her RFC, education, and work experience, the VE testified that there were approximately 55,000 jobs in the State of Michigan that the hypothetical person would be capable of performing. (A.R. 58-61). The ALJ found that this constituted a significant number of jobs. Using Rules 201.27 of the Medical-Vocational Guidelines as a framework, the ALJ held that plaintiff was not disabled. (A.R. 15-26).

**1.**

Plaintiff argues that the ALJ failed to consider the "cumulative effects" of her severe impairments. (Plf. Brief at 5-6). The ALJ stated that he did consider the combined effect of plaintiff's impairments. (A.R. 16). Given this statement, the ALJ was not required to further elaborate on his thought process. *See Gooch v. Secretary of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987); *see also Despins v. Commissioner*, 257 F. App'x 923, 931 (6th Cir. 2007).

**2.**

Plaintiff argues that the ALJ "failed to defer" to the testimony of Jeffrey J. VanWingen, M.D., and erroneously referred to Dr. VanWingen as an examining, rather than a

treating, physician. (Plf. Brief at 6-7; Reply Brief, docket # 11). Upon review, I find no violation of the treating physician rule and that references to Dr. VanWingen as an examining physician rather than a treating physician constituted harmless error.

The ALJ's opinion refers to Dr. VanWingen as a treating (A.R. 24) and an examining (A.R. 23, 24) physician. Dr. VanWingen is more accurately described as a treating family physician who treated plaintiff on a relatively infrequent basis during the latter portion of the period at issue: October 25, 2006, through May 6, 2009.[4] Dr. VanWingen has treated plaintiff for a number of ailments, including hypertension and headaches. On October 31, 2006, plaintiff informed Dr. VanWingen that for approximately two weeks she had been experiencing headaches. She stated that she was under a tremendous amount of stress at home and had very little support. Plaintiff continued to smoke cigarettes. Her blood pressure was 132/110. Dr. VanWingen's diagnosis was "MIGRAINE, COMMON with hypertension." (A.R. 221-22). He provided plaintiff with a prescription for Toprol XL and instructed her to return in two weeks. (A.R. 222). On November 14, 2006, plaintiff stated that her headaches had significantly improved. (A.R. 219). On November 27, 2006, plaintiff reported that she did not have chest pain, shortness of breath, dyspnea on exertion, or headache. Plaintiff continued to smoke despite her history of hypertension. (A.R. 217). Dr. VanWingen noted that plaintiff was not in any acute distress. He made the following observations regarding plaintiff's cardiovascular condition:

---

[4]According to plaintiff's count (Reply Brief at 2), she had six office visits with VanWingen in 2006 (two within the period at issue), nine office visits in 2007, and three office visits in 2008. Defendant argues that the records indicate less frequent treatment. (Def. Brief at 18 n. 7). It is unnecessary to resolve these minor discrepancies. The opinions plaintiff relies on are not found in VanWingen's treatment records. They appear in the April 2009 statement Dr. VanWingen gave to plaintiff's attorney. (A.R. 399-405). Plaintiff did not submit any 2009 medical records in support of her claim for SSI benefits.

CARDIAC(PALPATION/ASCULTATION): PMI not displaced. No thrills, lifts, or palpable S3 or S4. Regular rate and rhythm with no murmurs, gallops, rubs or abnormal heart sounds. EDEMA/VARICOSITIES OF EXTREMITIES: No edema or varicosities of the extremities.

(A.R. 218).

On March 6, 2007, plaintiff's blood pressure was 140/80. She was not experiencing chest pain, shortness of breath, dyspnea on exertion, pedal edema, or headache. Dr. VanWingen noted that plaintiff experienced "no complication from the medication presently being used," and prescribed a change in medication to address plaintiff's increased blood pressure. (A.R. 366). On June 15, 2007, plaintiff's blood pressure was down to 122/84, which Dr. VanWingen found satisfactory. (A.R. 368-69). On August 3, 2007, plaintiff reported "on and off" headache pain that was worse at the end of the day. She did not have visual disturbances or focal deficits. Dr. VanWingen offered a diagnosis of tension headaches and recommended hydration and continued use of NSAIDS and the samples of Skelaxin that he had provided. (A.R. 353-54). On October 12, 2007, plaintiff related that she continued to smoke one-half pack of cigarettes per day. She had not taken her medication, so her blood pressure reached 154/98. (A.R. 349). A week later, plaintiff reported that she had taken her medication, reduced the number of cigarettes she smoked, and generally felt better. Her blood pressure was 126/70. (A.R. 347). On July 28, 2008, plaintiff complained of right wrist pain. X-rays revealed no evidence of fracture and there was no soft tissue abnormality. Dr. VanWingen recommended Tylenol. He noted that plaintiff's judgment was appropriate. She was oriented with normal memory. Her mood and affect were appropriate. (A.R. 342). On August 29, 2008, plaintiff reported feeling overwhelmed. Dr. VanWingen found that plaintiff's judgment was appropriate and her memory was normal. She was oriented and her mood and affect were appropriate. He recommended that plaintiff see a counselor and take time for herself each day to

relax. (A.R. 339). On September 12, 2008, plaintiff complained that she had a headache. Dr. VanWingen stated that it was probably stress-related. (A.R. 337).

Plaintiff relies on the April 1, 2009 sworn statement that Dr. VanWingen gave in support of her claim for SSI benefits. (A.R. 399-405). Dr. VanWingen stated that it had been about five months since he had last seen plaintiff. (A.R. 402). Plaintiff's attorney did not ask Dr. VanWingen for a medical diagnosis of plaintiff's condition. Instead, counsel inquired about plaintiff's primary medical complaints:

> Q   What are Ms. McDay's primary medical complaints?
>
> A   Angie suffers from low back pain, hypertension, chronic headaches, fatigue, stress and urgent [in]continence and the sequellae of bilateral dissected carotid arteries.

(A.R. 402). Plaintiff did not have any current left-sided weakness stemming from her carotid artery dissections. Headaches were her primary complaint. (A.R. 402). Plaintiff reported that she experienced photophobia and blurred vision with her headaches. (A.R. 402). She had stated that her back pain increased as her activity level increased. (A.R. 403). Dr. VanWingen described possible causes for plaintiff's reported fatigue and her medications that could possibly exacerbate it. (A.R. 403-04). Dr. VanWingen expressed an opinion that plaintiff would be unable to work:

> Q   . . . If Ms. McDay indicated at hearing that her Atenolol makes her dizzy, gives her what she described as a medicine head and that she said she will have to lie down after she takes this med, would that be consistent with the side effects of this medication?
>
> A   It's definitely possible.
>
> Q   In addition to fatigue, Ms. McDay will report that she lies down intermittently throughout the day due to low back pain and other symptoms. Would that be consistent with her presentation?
>
> A   Yes.

> Q  As to Ms. McDay's incontinence issues, if Ms. McDay was going to engage in any type of substantial activity or competitive work, would she require as-needed bathroom breaks throughout the day?
>
> A  Yes. She has overactive bladder which means that she suffers urgency. We haven't been completely successful in treating her with medication for that.
>
> Q  In addition to her need for bathroom breaks as needed, would Ms. McDay need intermittent periods throughout the day to lie down either for pain control or due to fatigue to rest throughout the day?
>
> A  I would say yes to that, and she would be prone to exacerbation, which would probably include missing work altogether.
>
> Q  If Ms. McDay attempted competitive work, do you think that she could coordinate these rest periods with the traditional half-hour for lunch and two 15-minute breaks, one at the beginning of the day and one at the end of the day, or would she need rest periods in excess of those rests – those breaks?
>
> A  My opinion is she would need more than that.
>
> Q  Would there be days, particularly when she's having headaches, that she would not be able to appear at work at all potentially?
>
> A.  Yes.

(A.R. 403-05).

The ALJ found that Dr. VanWingen's 2009 statement was entitled to little weight because it was inconsistent with other medical evidence, vague, conclusory, and based on plaintiff's subjective statements rather than objective evidence:

> As far as opinion evidence, consideration has also been given to the reports of the state agency medical consultants as well as to other treating, examining, and non-examining medical sources. (20 CFR 416.927 and Social Security Rulings 96-2p, 96-5p and 96-6p). The conclusions reached by the State Disability Determination Services (Exhibit(s) 4F and 8F)[A.R. 284-97, 319-26] also support a finding of "not disabled." Although those were non-examining consultants, and therefore their opinions do not as a general matter deserve as much weight as those of an examining or treating physicians, those opinions do deserve some weight, particularly in a case like this in which there exist a number of other reasons to reach similar conclusions.

>March 2, 2007, Dr. Hille[l]son opined that the claimant should avoid any high impact activities such as jumping and squatting [and they] should be kept to a minimum. Squatting should also be minimized because of her left ankle. Her ankle range of motion was good and she does not need specific restrictions based on her ankle that would be different from restrictions because of her back pain. Dr. Hille[l]son noted that the claimant drove; and further opined that the claimant could perform most activities of daily living both at home and in the workplace. He opined that her problems with balance might be periodic, therefore she should avoid climbing, heights, or being in situations where balance is absolutely necessary; and that stair climbing should be done with railings. I have accorded some weight to Dr. Hille[l]son's opinion as it is well supported by the other substantial evidence of record (Exhibit 7F)[A.R. 309-18].
>
>Examining physician Jeffrey J. VanWingen, M.D., opined in a sworn affidavit dated April 1, 2009, that the combination of the claimant's impairments would preclude the claimant from engaging in substantial gainful activity on a competitive basis (Exhibit 10F)[A.R. 399-405]. The doctor's opinion was based on the claimant's subjective complaints. The doctor's opinion is quite conclusory, providing very little explanation of the evidence relied on in forming that opinion. The doctor had only a short-term treatment relationship. The doctor does not provide a function by function analysis. The doctor's opinion is vague.

(A.R. 23-24).

The issue of whether the claimant is disabled within the meaning of the Social Security Act is reserved to the Commissioner. 20 C.F.R. § 416.927(e)(1); *see Warner v. Commissioner*, 375 F.3d 387, 390 (6th Cir. 2004). A treating physician's opinion that a patient is disabled is not entitled to any special significance. *See* 20 C.F.R. § 416.927(e)(1); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007). Likewise, "no special significance" is attached to treating physician opinions regarding the credibility of the plaintiff's subjective complaints, RFC, or whether the plaintiff's impairments meet or equal the requirements of a listed impairment because they are administrative issues reserved to the Commissioner. 20 C.F.R. § 416.927(e)(2); *see Allen v. Commissioner*, 561 F.3d at 652.

"Generally, the opinions of treating physicians are given substantial, if not controlling deference." *Warner v. Commissioner*, 375 F.3d at 390. A treating physician's opinion is not entitled

to controlling weight where it is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(d)(2); *see Cox v. Commissioner*, 295 F. App'x 27, 35 (6th Cir. 2008) ("This court generally defers to an ALJ's decision to give more weight to the opinion of one physician than another, where, as here, the ALJ's opinion is supported by evidence that the rejected opinion is inconsistent with the other medical evidence in the record."). The ALJ "is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation." *Buxton*, 246 F.3d at 773; *see Kidd v. Commissioner*, 283 F. App'x 336, 340 (6th Cir. 2008). An opinion that is based on the claimant's reporting of her symptoms is not entitled to controlling weight. *See Young v. Secretary of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990); *see also Mitchell v. Commissioner*, 330 F. App'x 563, 570 (6th Cir. 2009); *Smith v. Commissioner*, 482 F.3d 873, 876-77 (6th Cir. 2007).

Even when a treating source's medical opinion is not given controlling weight because it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the record, the opinion should not necessarily be completely rejected; the weight to be given to the opinion is determined by a set of factors, including treatment relationship, supportability, consistency, specialization, and other factors. *See Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions*, SSR 96-2p (reprinted at 1996 WL 374188 (SSA July 2, 1996)); 20 C.F.R. § 404.1527(d); *Martin v. Commissioner*, 170 F. App'x 369, 372 (6th Cir. 2006).

The Sixth Circuit has held that claimants are "entitled to receive good reasons for the weight accorded their treating sources independent of their substantive right to receive disability

benefits." *Smith v. Commissioner*, 482 F.3d 873, 875-76 (6th Cir. 2007); *see Allen v. Commissioner*, 561 F.3d 646, 651 (6th Cir. 2009); *Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004). "The procedural requirement exists, in part, for claimants to understand why the administrative bureaucracy deems them not disabled when physicians are telling them that they are." *Smith*, 482 F.3d at 876; *see Rabbers v. Commissioner*, 582 F.3d 647, 657 (6th Cir. 2009).

I find no violation of the treating physician rule. Dr. VanWingen's opinions, as contained in his 2009 statement, were not well supported by objective evidence and were not entitled to controlling weight. The ALJ complied with the procedural requirement of providing "good reasons" for the weight he gave to Dr. VanWingen's opinions. Although the ALJ's description of Dr. VanWingen's physician/patient relationship with plaintiff as "short-term" was inaccurate, his remaining observations more than suffice as good reasons for the weight he gave to VanWingen's opinions. Dr. VanWingen's opinions were vague, conclusory, and based on his assigning full credibility to plaintiff's subjective complaints rather than objective test results. The ALJ is responsible for making the factual finding regarding the claimant's credibility, not the treating physician. *See Allen v. Commissioner*, 561 F.3d at 652; *see also Ferguson v. Commissioner*, 628 F.3d 269, 274 (6th Cir. 2010).

**3.**

Plaintiff's arguments that the ALJ applied a "sit and squirm" test and that his credibility determination is not supported by substantial evidence (Plf. Brief at 7) cannot withstand scrutiny. Credibility determinations concerning a claimant's subjective complaints are peculiarly within the province of the ALJ. *See Gooch v. Secretary of Health & Human Servs.*, 833 F.2d 589,

592 (6th Cir. 1987); *see also Payne v. Commissioner*, No. 08-4706, 2010 WL 4810212, at * 3 (6th Cir. Nov. 18, 2010). It is the ALJ's function to determine credibility issues. *See Siterlet v. Secretary of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). The court does not make its own credibility determinations. *See Walters v. Commissioner*, 127 F.3d at 528; *see McGlothlin v. Commissioner*, 299 F. App'x 516, 523-24 (6th Cir. 2008). The court cannot substitute its own credibility determination for the ALJ's. The court's "review of a decision of the Commissioner of Social Security, made through an administrative law judge, is extremely circumscribed . . . ." *Kuhn v. Commissioner*, 124 F. App'x 943, 945 (6th Cir. 2005). The Commissioner's determination regarding the credibility of a claimant's subjective complaints is reviewed under the deferential "substantial evidence" standard. "Claimants challenging the ALJ's credibility determination face an uphill battle." *Daniels v. Commissioner*, 152 F. App'x 485, 488 (6th Cir. 2005). "Upon review, [the court must] accord to the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which [the court] d[oes] not, of observing a witness's demeanor while testifying." *Jones*, 336 F.3d at 476. "The ALJ's findings as to a claimant's credibility are entitled to deference, because of the ALJ's unique opportunity to observe the claimant and judge h[is] subjective complaints." *Buxton v. Halter*, 246 F.3d at 773. "Since the ALJ has the opportunity to observe the demeanor of the witness, his conclusions with respect to credibility should not be discarded lightly and should be accorded deference." *Casey v. Secretary of Health & Human Servs.*, 987 F.2d 1230, 1234 (6th Cir. 1993); *see White v. Commissioner*, 572 F.3d 272, 287 (6th Cir. 2009).

The ALJ's opinion contains a lengthy discussion of the medical evidence, plaintiff's subjective complaints, and the reasons why he found that plaintiff's testimony was not fully credible.

(A.R. 22-24). The opinion provides a more than adequate explanation supporting the ALJ's factual finding regarding plaintiff's credibility. *See Rogers v. Commissioner*, 486 F.3d 234, 247-49 (6th Cir. 2007). The accusation that the ALJ applied a "sit and squirm" test is often raised when the ALJ's opinion includes a statement regarding his or her personal observations. *See Lucido v. Commissioner*, 109 F. App'x 715, 716 (6th Cir. 2004); *Harris v. Heckler*, 756 F.2d 431, 439 (6th Cir. 1985). These challenges are almost never meritorious, and this one is no exception. Like any other trier of fact, the ALJ is allowed to rely on his or her personal observations of a witness as an aid to determining credibility. The ALJ's ability to do so gives a unique perspective on the claimant's credibility and is a major reason for the deference accorded to the ALJ's findings. It is well established that the ALJ cannot rely *solely* upon his observations at the hearing in resolving a claimant's subjective complaints. *See Weaver v. Secretary of Health & Human Servs.*, 722 F.2d 310, 312 (6th Cir. 1983). However, it is equally well established that an ALJ "may distrust a claimant's allegations of disabling symptomology if the subjective allegations, the ALJ's personal observations, and the objective medical evidence contradict each other." *Moon v. Sullivan*, 923 F.2d 1175, 1183 (6th Cir. 1990); *see Lucido v. Commissioner*, 109 F. App'x at 716-17. It was appropriate for the ALJ to take into account plaintiff's demeanor at the hearing, as well as her daily activities, in making his credibility determination. *See Cruse v. Commissioner*, 502 F.3d 532, 542 (6th Cir. 2007); *Blacha v. Secretary of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990); *see also Perschka v. Commissioner*, No. 09-6328, 2010 WL 5439794, at * 5 (6th Cir. Dec. 30, 2010). Plaintiff's activities included taking her children to school and picking them up, driving herself to doctor's appointments, conducting business over the telephone, preparing meals for herself and her family, cleaning laundry,

grocery shopping, and taking care of a dog, which undercut her claims of disabling functional limitations. I find that the ALJ credibility is supported by more than substantial evidence.

**4.**

Plaintiff argues that the hypothetical question the ALJ posed to the VE was inaccurate because it did not "properly address" her complaints of chronic pain, fatigue, and "need to take intermittent breaks." (Plf. Brief at 6-7). This is a mere reformulation of plaintiff's unsuccessful challenge to the ALJ's credibility determination. The ALJ found that plaintiff's testimony was not fully credible. It is well settled that a hypothetical question to a VE need not include unsubstantiated limitations. *See Casey*, 987 F.2d at 1235; *see also Carrelli v. Commissioner*, 390 F. App'x 429, 438 (6th Cir. 2010) ("[I]t is 'well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact.'") (quoting *Casey*, 987 F.2d at 1235). The VE does not determine a claimant's medical restrictions or how they impact on the claimant's residual functional capacity -- that is the ALJ's job. *See Webb v. Commissioner*, 368 F.3d 629, 633 (6th Cir. 2004); *Maziarz v. Secretary of Health & Human Servs.*, 837 F.2d 240, 247 (6th Cir. 1987). The ALJ uses vocational expert testimony in the process of determining whether a significant number of jobs exist that a claimant can perform despite her impairments. 837 F.2d at 247. It is common practice for an ALJ to ask the VE a hypothetical question incorporating a possible finding of disabling pain, fatigue, and other subjective complaints. *See, e.g.*, *Rabbers v. Commissioner*, 582 F.3d 647, 651 (6th Cir. 2009); *Bingaman v. Commissioner*, 186 F. App'x 642, 646 (6th Cir. 2006). Merely posing the hypothetical question does not compel the ALJ to find that the claimant actually suffered disabling pain, fatigue, or other subjective

symptoms. The hypothetical question and response simply create a record from which the ALJ could base a decision finding that a significant number of jobs do or do not exist, in the event that the ALJ concludes that the claimant indeed suffers the degree of limitation she claims. Here, the ALJ found that plaintiff's subjective complaints were not fully credible. The ALJ was not bound in any way by a VE's response to a hypothetical question incorporating a contrary assumption.

## **Recommended Disposition**

For the reasons set forth herein, I recommend that the Commissioner's decision be affirmed.

Dated: March 14, 2011         /s/ Joseph G. Scoville
                              United States Magistrate Judge

### **NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b). Failure to file timely and specific objections may constitute a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir.), *cert. denied*, 129 S. Ct. 752 (2008); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). General objections do not suffice. *Spencer v. Bouchard*, 449 F.3d 721, 724-25 (6th Cir. 2006); *see Frontier*, 454 F.3d at 596-97; *McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006).